one-half a block away]. The motorman of a street car has the duty of approaching a crossing with the car under control." Schoener v. Railway Co., 72 App. Div. 23, 76 N. Y. Supp. 157. It was error to render a judgment in favor of the defendant under the facts and circumstances shown in this case.

Judgment reversed and new trial granted, with costs to appellants to abide event.

(3!/ Misc. Rep. 27.)

KNICKERBOCKER ICE CO. v. FORTY–SECOND ST. & GRAND ST. FERRY R. CO. et al.

(Supreme Court, Special Term, New York County.   October, 1902.)

1. MUNICIPAL GRANTS—WATER LOTS—RIGHTS OF GRANTEE.
   The city of New York conveyed in 1850 certain water lots in the Hudson river, bounded on the north by the center line of Forty-Third street, on the south by the center line of Forty-Second street, on the east by high-water mark, and on the west by Thirteenth avenue, "the permanent exterior line of said city," excepting so much of Twelfth and Thirteenth avenues and Forty-Second and Forty-Third streets, as shown by maps annexed, as came within the boundaries; the grantee agreeing at his own expense to make such streets and avenues and wharves and bulkheads forming a part thereof when ordered by the city.   In 1858 a pier lying wholly within the lines of Forty-Third street at its foot and in Twelfth avenue was also conveyed to the grantee by the city.   Thereafter this property came to plaintiff, and the water lots essential to the use of the south side of the pier came to defendant railroad company, and were so used by it after 1860.   The city, on plaintiff's agreement to pay rent, extended the pier in 1873, and in 1890 the department of docks ordered the railroad company to construct a bulkhead between the south side of Forty-Third street and the south side of Forty-Second street, and plaintiff sued for an injunction, as this would fill in his land south of his pier.   The resolution for a bulkhead was rescinded, and the railroad company was ordered to construct Twelfth avenue between Forty-Third and Forty-Second streets.   *Held*, that plaintiff, having no title to the pier or the land under it, could not restrain such improvement.

2. SAME—CONVEYANCE OF PUBLIC PIER.
   The city of New York has no power to grant away a public pier within the boundaries of a street held in trust by the city for the public use.

3. SAME—ADVERSE POSSESSION.
   Forty years' occupation of a pier built by the city on agreement of plaintiff to pay rent for the extension and to claim no title to it would give the plaintiff no right thereto by adverse possession.

4. SAME—IMPROVEMENTS BY CITY.
   Where a city granted certain water lots, with a provision for the extension of a city street thereupon, it might lawfully construct a bulkhead across the water lots, where the result would be practically the same as if such street had been built and filled in.

Action by the Knickerbocker Ice Company against the Forty-Second Street & Grand Street Ferry Railroad Company and others for an injunction. Judgment for defendants.

Daly, Hoyt & Mason (Albert Stickney and M. Edward Kelly, of counsel), for plaintiff.

George L. Rives, Corp. Counsel (Edwin J. Freedman, of counsel), for the City.

James A. Deering and Clarence L. Barber, for defendant railroad company.

STECKLER, J. The action is for an injunction restraining the defendants the city of New York, the department of docks, and the Forty-Second Street & Grand Street Ferry Railroad from constructing a bulkhead across the railroad company's water lots in the Hudson river from the southerly side of West Forty-Third street to the . southerly side of West Forty-Second street. In July, 1850, the city conveyed to Caleb F. Lindsley in fee by two conveyances certain water lots, or grounds under water, bounded on the north by the center line of Forty-Third street, on the south by the center line of Forty-Second street, on the east by high-water mark, and on the west by the westerly line of Thirteenth avenue, said last-mentioned line being described as "the permanent exterior line of said city." These instruments were duly recorded in August following. There was excepted from said deeds (Langdon v. City of New York, 93 N. Y. 149) so much of the granted premises as by the annexed maps formed parts or portions of Twelfth and Thirteenth avenues, Forty-Third and Forty-Second streets, for the uses and purposes of public streets, avenues, and highways. The grantee covenanted for himself, his heirs and assigns, when required so to do by the grantor, to build at his own expense, in accordance with the resolutions or ordinances of the grantor, good and sufficient bulkheads, wharves, streets, or avenues which should form so much and such parts of Forty-Second and Forty-Third streets, Twelfth and Thirteenth avenues, as fell within the limits of the described premises, and reserved from out thereof for public streets; to fill in the same with earth, and regulate and pave the same, and lay the sidewalks thereof; to forever at his own expense keep in good order and repair the whole of said streets and avenues included in the conveyances, and to obey all resolutions and ordinances of the grantor in relation thereto; also that those portions of the streets or avenues included in the deeds should forever remain streets, avenues, or highways for the common use and passage of the inhabitants of the city. On its part the city covenanted that Lindsley, upon observing his covenants, should be entitled to wharfage accruing "from that part of the said exterior line of the said city lying on the westerly side of the hereby granted premises fronting on the Hudson river," excepting therefrom the wharfage to accrue from the westerly end of the bulkhead in front of the entire width of the southerly half of Forty-Third street, and from the westerly end of the bulkhead in front of the northerly one-half part of Forty-Second street. It was further provided in the deeds that the intent of the conveyances was merely to convey to the grantee whatever estate the grantor had or could lawfully claim in the premises.

On November 11, 1852, the city conveyed to the said Caleb F. Lindsley the property now claimed by plaintiff by the following description:

"All the estate, right, title, and interest of the said parties of the first part of, in, and to all that certain pier in the city of New York, situate at the foot

of Forty-Third street, North river, bounded, described, and containing as follows: Beginning at the point formed by the intersection of the northerly side of Forty-Third street with the easterly line or side of the Twelfth avenue; running thence southerly, along the easterly side of Twelfth avenue, to the northerly side of said pier; thence westerly, two hundred and eleven feet three inches; thence southerly, forty feet five inches; thence easterly, two hundred and twelve feet two inches, to the easterly side of the Twelfth avenue; and thence southerly to a point where the southerly side of Forty-Third street intersects the said Twelfth avenue; together with the extent of the present width of the street (neither the pier nor the description covering the width of the street) with the right of wharfage thereon, and together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof; and also all the estate, right, title, interest, property, possession, claim, and demand whatsoever, as well in law as in equity, of the said parties of the first part, of, in, or to the above-described premises, and every part and parcel thereof, with the appurtenances, subject to the right of the parties of the first part to order said pier extended into the river at the expense of the said party of the second part whenever and in whatever way they may see fit, reserving to the party of the first part to extend said pier at the expense of the corporation of the city of New York, or to grant the right to do so to other parties if the said party of the second part fail or neglect to extend said pier when ordered so to do, in which case the right of wharfage, etc., at the portion of the pier extended shall belong to the parties at whose expense the extension shall be made."

And the deed provided, as had the deeds of 1850, that the true intent and meaning of the conveyance was to pass only whatever right and title the city had in the premises.

In 1855 Lindsley conveyed the property described in the three deeds to John La Farge, and both the plaintiff and the defendant railroad company hold under mesne conveyances from La Farge's devisees. In 1860, by deed recorded in May of that year, La Farge's devisees conveyed the pier property to Charles Scholey, James Schindler, and Edward E. Conklin; and they thereafter, by deed dated July 21, 1865, and recorded January 17, 1870, conveyed the same property to the New York Ice Company, which company on March 7, 1867, by deed recorded January 17, 1870, conveyed said premises to the plaintiff. By deed dated in February, 1863, La Farge's devisees conveyed all the property described in the three deeds to Lindsley, except the pier property theretofore conveyed to Scholey, Schindler, and Conklin, to Charles E. Appleby, who in the following March conveyed the same to the defendant railroad company.

In 1873, by order of the board of docks, the pier was extended into the river a further distance of 300 feet, and widened so as to be 60 feet, the entire breadth of the street, in width for its entire length. These extensions were made upon plaintiff's written agreement to pay rent for the land under water covered by the extensions in length and breadth of the pier, and on the express condition that whenever any portion of the land belonging to the city and covered by the extensions should be required by the city for permanent improvement of the water front the plaintiff would make no claims for damages for any structures or improvements upon the city's land, and upon the further conditions that nothing contained in the permission or order of the dock department for the extension of the

pier "shall be considered or construed as a waiver of the title of the city in and to the land lying outside of the dimensions of the present pier owned by the Knickerbocker Ice Company as laid down in the deed from the mayor, aldermen, and commonalty of the city of New York to Caleb F. Lindsley, dated November 11, 1852."

This same plaintiff, in or about 1882, brought an action in the superior court of the city of New York against the defendant railroad company in this action, and its lessee, the New York, Ontario & Western Railway Company, to enjoin and restrain said companies from filling in the railroad company's land under water to the south of the pier; and plaintiff's motion for an injunction pendente lite was granted by Judge Freedman at special term, the grounds of the decision being that plaintiff owned the old pier and the appurtenances, together with the extent of the width of the street covered by the pier; that as to the defendants in that action the plaintiff had an easement in the waters south of the pier for the loading and unloading of vessels, which easements the defendants' acts would destroy; and that said acts were not done in pursuance of any requirement or resolution by the city, or of anything which the defendant owner was required to do in pursuance of the covenants contained in the deed by the city to Lindsley in 1850, subject to which covenants plaintiff enjoyed possession of the pier. Judge Freedman's decision apparently terminated the first action.

Subsequently, on December 4, 1890, the board of docks by resolution directed the defendant railroad to construct the bulkhead authorized by the legislature in front of said defendant's water lot, and that resolution led to the bringing of this suit, in which the plaintiff seeks to enjoin the construction of the proposed bulkhead. In 1892, after the suit was begun, the dock board made a contract with the plaintiff, subject to the approval of the commissioners of the sinking fund, for the purchase by the city of all plaintiff's interest in the pier and the land on which it stood for $120,000, but the contract did not receive the approval of the commissioners. During the negotiations plaintiff abandoned the pier. At the request of the corporation counsel the board of docks, in 1897, rescinded the resolution requiring the construction of the bulkhead; and in 1900 the board, by resolution, ordered the defendant railroad to construct Twelfth avenue, between the middle of Forty-Third street and the middle of Forty-Second street, and regulate and pave the same, and lay the sidewalks thereon, in pursuance of the covenants of the deed by the city to Lindsley in 1850. Such construction would result in the filling in of the land under water south of the old pier.

In this action the plaintiff's title has been vigorously assailed. Nevertheless I would follow and adopt the lucid and exhaustive opinion of Judge Freedman on that point but for the fact that plaintiff's counsel, who was also counsel for plaintiff in the suit in the superior court, asserts that the title has never been questioned until now, and I therefore feel it my duty to examine into that subject.

The land on which the said pier stands and the adjoining lands owned by the defendant railroad company south of the pier are all west of the east line of the present Twelfth avenue, and were formerly

land under water exterior to the high-water line of the Hudson river. The Dongan charter, in 1686, granted to the city all the land between high and low water mark around Manhattan Island, and that grant was confirmed in 1730 by the Montgomerie charter, which, in addition, conveyed to the city a strip of land 400 feet in width immediately outside of low-water mark, from Corlear's Hook, on the East river, to Bestaver's rivulet, excepting, however, the space in front of the Battery. Both of these charters were confirmed by chapter 584 of the Laws of 1732, and afterwards by the constitution of 1777. By chapter 115 of the Laws of 1807 a strip of land under water 400 feet wide from low-water mark was directed to be conveyed to the city along the easterly shore of the Hudson river for four miles north of Bestaver's rivulet, and for two miles north of Corlear's Hook, on the westerly shore of the East river, and the statute provided that the proprietors of the adjacent lands should have the pre-emptive right in all grants made by the city of the lands under water conveyed under the act. The said grant was subsequently made by the commissioners of the land office. Under said statute, also, the city map, on April 1, 1811, was filed laying out Forty-Second and Forty-Third streets from river to river. As so laid out Forty-Third street extended to low-water mark on the Hudson river. In 1826 the strip of land 400 feet wide from low-water mark was directed to be extended to the north end of the island, along the Hudson and East rivers, to the Harlem river (Laws 1826, c. 58), in compliance with which mandate the commissioners in the same year made said grant to the city.

By chapter 182 of the Laws of 1837 the legislature established Thirteenth avenue, as laid out on a map made by George B. Smith, city surveyor, as the exterior line of the city between Hammond street and West One Hundred and Thirty-Fifth street; extended all the cross streets thereto; granted to the city all the right, title, and interest of the people of the state in the land and Thirteenth avenue not included in former grants; and gave to the proprietors of the adjacent lands pre-emptive rights in all grants to be made by the city of the lands under water granted by said statute. These extensions of existing streets and avenues were made by the legislative fiat, and condemnation proceedings were unnecessary to give the city title to any part of the lands below low-water mark which theretofore it did not own. Upon the survey referred to in the act the pier in question appears within the lines of Forty-Third street as laid out thereon. In 1838, under the street opening act of 1813, the city acquired title to Forty-Third street from the East river to the high-water line of the Hudson river. The municipality in 1850 regulated and paved Forty-Third street, and a map was made showing the grading to the east side of Twelfth avenue, and in the same year an assessment was levied for the paving. An ordinance was passed in 1844 regulating the powers of the commissioners of the sinking fund. It authorized said commissioners to sell and dispose of at public auction all real estate of the corporation not in use for or reserved for public purposes (title 4, § 17), and provided (title 4, § 14) that all grants made by virtue of the ordinance should contain "the usual covenants, including those in relation to streets or avenues passing through them, and also in relation to

bulkheads and wharfage." This ordinance was confirmed by chapter 225 of the Laws of 1845. In 1871 the board of docks adopted plans, by direction of the legislature (Laws 1870, c. 383, § 33; Laws 1871, c. 574, § 6), for a system of wharf improvements, by which a new bulkhead or exterior line was established considerably east of Thirteenth avenue, as laid out in 1837, and at a distance of 150 feet west of Twelfth avenue. This bulkhead is the line of solid filling. The effect of the adoption of this plan was to limit the point to which Forty-Third street could be built or constructed by solid filling, although the lines of the street were retained. None of the acts providing for the change of the plan of the water front discontinued the streets as established by the act of 1837, or affected the rights of the owners of the water lots extending from Twelfth to Thirteenth avenues, other than to restrict the extent to which solid filling might be made and the length of the piers to be constructed, and also excepting that the city was given the power to construct the new bulkhead and the new pier when desired, and in so far as necessary to condemn such private property rights as should be required for the purpose.

It was testified on the trial that, among the "usual covenants" referred to in the ordinance of 1844 prescribing how corporate real property not in use for or reserved for public purposes should be sold, were covenants that the grantee in conveyances of land under water would, at his own expense and when requested by the grantor, construct bulkheads, wharves, streets, or avenues which should form so much and such parts of the streets or avenues as fell within the limits of the premises described in the conveyance and reserved from out thereof for public streets, and would fill in and pave the same and lay the sidewalks thereon; would forever keep said streets in good order and repair, and observe all ordinances and resolutions of the grantor; also covenants that said streets should forever continue to be and remain public streets; and in case of default by the grantee in building the bulkheads, wharves, streets, or avenues, or in complying with any resolution or ordinance by the city, that the grantor could do said work or sell the premises at public auction, and in case of a deficiency charge the grantee with the amount thereof. None of these covenants was in the deed to Lindsley of 1852, under which the plaintiff claims title. The effect of inserting such covenants in the deed of 1852 would be to practically nullify the conveyance, for the width of the street which with the pier was attempted to be conveyed would at the same time be excepted from the operation of the deed. Langdon v. City of New York, 93 N. Y. 129. Further, by the act of 1837 that part of Forty-Third street between the easterly side of Twelfth avenue and the Thirteenth avenue, upon a portion of which the old pier was constructed, was reserved for public use, and under the ordinance title to the premises described in the deed of 1852 could not be conveyed. See Consolidated Ice Co. v. City of New York, 53 App. Div. 260, 65 N. Y. Supp. 912, affirmed in 166 N. Y. 92, 59 N. E. 713.

But, independent of the ordinance, the plaintiff failed to establish title to the pier or the land upon which it stands. As far as

the extension to the pier is concerned, the occupation was merely as a tenant at will or licensee of the city, and the acts complained of do not constitute a grievance cognizable in equity. As regards the original pier—a public pier—described in the deed to Lindsley in 1852, that pier as it existed prior to 1852, and the land under the same, are wholly within and part of Forty-Third street, a public street of the city of New York, as established by law, and held by the city in trust for public use, and were part of such public street at the time of the alleged grant to Lindsley; and no city board, officer, department, or local authority had power to convey the same in fee or otherwise. "A municipal corporation has no implied or incidental authority to alien or to dispose of, for its own benefit, property dedicated to or held by it in trust for the public use, or to extinguish the public uses in such property, nor is such property subject to the payment of the debts of the municipality." 2 Dill. Mun. Corp. (4th Ed.) § 650; Commissioners v. Armstrong, 45 N. Y. 234, 6 Am. Rep. 70. As the supreme court of the United States said in Meriwether v. Garrett, 102 U. S., at page 514, 26 L. Ed. 197: "In its streets, wharves, cemeteries, hospitals, courthouses, and other public buildings the corporation has no proprietary rights distinct from the trust for the public. It holds them for public use, and to no other use can they be appropriated without special legislative sanction. It would be a perversion of that trust to apply them to other uses." See, also, St. Vincent Asylum v. City of Troy, 76 N. Y. 108, 32 Am. Rep. 286; Kane v. Railroad Co., 125 N. Y. 183, 26 N. E. 278, 11 L. R. A. 640.

The Langdon Case, 93 N. Y. 129, which the plaintiff claims is decisive of the rights asserted by it in this action, is materially different from this case. There the grant of lands under water, which was made in 1810, excepted the streets to be made on said lands by the grantee from the operation of the grant, and the act of the legislature passed in 1798 provided (chapter 80, § 5) that it should be lawful for the city to direct piers to be sunk and completed at such distances and in such manner as it should deem proper in front of the streets and wharves, to be made at the expense of the proprietors of the lots lying opposite to the places where such piers should be directed to be sunk. And West street, the westerly line of which was the grantee's bulkhead, was the "permanent line" bounding the Hudson river on the east. Even if it be true that the statute of 1798 referred to other streets than West and South streets, the confirmation by the legislature (Laws 1845, c. 225) of the municipal ordinance of 1844, hereinbefore referred to, virtually repealed any portion of the act of 1798 which might be construed as allowing private individuals to construct piers on the extension of streets beyond high-water mark. As plaintiff's grant was illegal and inoperative, it necessarily follows that the right of wharfage claimed as incidental to the ownership of the pier also falls.

The plaintiff contends, however, that, even if the conveyance of 1852 was void, it had, at the time of the commencement of the action, acquired title to the property in question by nearly 40 years

of adverse possession. I cannot agree with that contention, for the reason that the occupation of the premises by the plaintiff constituted a public nuisance (People v. Vanderbilt, 26 N. Y. 287), and the right to maintain a public nuisance cannot be acquired by prescription or adverse possession (1 Wood, Nuis. [3d Ed.] pp. 40, 43; Burbank v. Fay, 65 N. Y., at page 70).

But, even if it should be assumed that plaintiff has title to the premises in question, it cannot procure injunctive relief in this action. Under the two deeds made by the city to Lindsley in 1850, over two years before he acquired title to the property occupied by plaintiff, there were conveyed to the grantee the lots under water extending from high-water mark (which at Forty-Third street was east of Twelfth avenue) on the east to the west line of Thirteenth avenue on the west, and from the center line of Forty-Third street on the north to the center line of Forty-Second street on the south, so much of the streets and avenues as fell within the boundaries being excepted. As pointed out by Judge Freedman in his opinion in the prior action (48 N. Y. Super. Ct., at page 499), the deed of 1852 conveyed no easements over any of the property granted in 1850, and such easements could, under the circumstances, not be created until after the ownership of both the pier and adjoining water lots vested in Lindsley, in 1852. As title to all of the property subsequently vested in John La Farge, the grant by his devisees of the pier, before they parted with the water lots conveyed in 1850, burdened those lots with an easement over the water south of the pier for a reasonable distance for access to the pier; so that merely as between the plaintiff and the defendant railroad the latter cannot lawfully do any act which would impair such easement. But, under the covenants made with the city by Linsdley, the defendant company is obliged, when so required, to build sufficient wharves and bulkheads and fill in such parts of Forty-Second and Forty-Third streets and Twelfth and Thirteenth avenues as fell within the premises described and excepted, and plaintiff's title is subject to the performance of those covenants, although such performance would destroy plaintiff's easements.

It is true that prior to this action no resolution was passed by the dock department requiring the defendant railroad to construct the streets and avenues included within the bounds of its water lots. There was, however, such a resolution requiring said defendant to construct a bulkhead in front of its water lots between the southerly side of Forty-Third street and the south side of Forty-Second street, and it seems to me that the defendant railroad had a right, at the direction of the city, to construct such a bulkhead upon its own land; for, although as a matter of fact such bulkhead would inure to the railroad company's benefit and destroy plaintiff's easement south of the old pier, its construction was required by the legislature. Its primary object was the carrying out of a great public improvement, and, though the bulkhead designed may possibly be not such a one as is contemplated by the covenants, the effect of such construction is exactly the same as if the railroad company filled in the streets under the stipulations in the deeds of 1850. The river

front must be improved by the construction of the bulkheads, and whether between Forty-Second and Forty-Third streets the improvement is made with the consent of the defendant railroad company or against its strenuous objection is, under the circumstances, a matter which concerns the defendants only. There must be judgment for defendants.

Judgment for defendants.